SILLS CUMMIS & GROSS P.C.
Andrew H. Sherman
George R. Hirsch
Boris I. Mankovetskiy
One Riverfront Plaza
Newark, New Jersey 07102
973-643-7000
*Attorneys for Bernard A. Katz, as*
*Debtor Representative and Liquidating Trustee*
*of the estate of Hudson Healthcare, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BERNARD A. KATZ, in his capacity as Debtor Representative and Liquidating Trustee, of the estate Hudson Healthcare, Inc.<br><br>_____Plaintiff,<br><br>vs.<br><br>HARVEY HOLZBERG, RON DIVITO, FRED DESANTI, ANDREW GREENE, ANTHONY LEITNER, SPIROS HATIRAS, JAMES CAULFIELD, ERIC LAWTON, CAMILLE COREA, KEVIN KRAMER, MICHELE RICHARDSON, DAVID ROBERTS, FREDERICK TOMKINS, MICHAEL NESTOR, SUSAN TONRY, HODULIK & MORRISON, P.A., MCENERNEY, BRADY & COMPANY, LLC, and MEDICAL SUPPORT SYSTEMS, INC.<br><br>_____Defendants. | Case  No:  2013 CV _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Bernard A. Katz, in his capacity as Debtor Representative and Liquidating Trustee ("Plaintiff") of the estate of Hudson Healthcare, Inc. ("HHI" or the "Debtor"), having an address at CohnReznick LLP, 333 Thornall Street Edison, New Jersey, by and through his attorneys, Sills Cummis & Gross P.C., for his Complaint against defendants Harvey Holzberg ("Holzberg"), Ron DiVito ("DiVito"), Fred DeSanti ("DeSanti"), Andrew Greene ("Greene"),

Anthony Leitner ("Leitner"), Spiros Hatiras ("Hatiras"), James Caulfield ("Caulfield"), Eric Lawton ("Lawton"), Camille Corea ("Corea"), Kevin Kramer ("Kramer"), Michele Richardson ("Richardson"), David Roberts ("Roberts"), Frederick Tomkins ("Tomkins"), Michael Nestor ("Nestor") and Susan Tonry ("Tonry") (collectively, the "Board Defendants"), Medical Support Systems, Inc. ("MSS"), Hodulik & Morrison, P.A. ("Hodulik"), McEnerney, Brady & Company, LLC ("McEnerney", and together with Hodulik, the "Audit Defendants" and with the Board Defendants and MSS, the "Defendants"), avers as follows:

## NATURE OF THE ACTION

1.      This Complaint seeks redress for the injuries caused by the Defendants to HHI and its creditors.  At every turn in HHI's short existence, each Defendant (whether individually or collectively) had the duty and opportunity to protect the interests of HHI and its creditors, but all such Defendants failed to do so.  Holzberg and DiVito negligently managed and reported financial results, while the HHI Board Defendants abdicated their statutory, contractual and fiduciary duties of management and oversight and ignored numerous red flags that should have prompted further inquiry.  The Audit Defendants, the last line of defense of financial oversight, negligently failed to detect material deficiencies in the presentation of HHI's financial statements.  The amalgam of this misconduct resulted in HHI incurring unsecured debts that it had no prospect of paying, all to the detriment of HHI and its creditors.

2.      This is an action seeking the entry of a money judgment against the Defendants and to set aside certain fraudulent transfers.

## JURISDICTION

3.      This action relates to the Chapter 11 case of Hudson Healthcare, Inc., Case No. 11-33014, which case is now pending in this District.

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

5.      Venue of this action is proper pursuant to 28 U.S.C. § 1409 and 28 U.S.C. §1391(b).

## PARTIES

6.      HHI was a New Jersey not-for-profit corporation acting as manager of the Hoboken University Medical Center, an acute care hospital providing community-based healthcare services in the City of Hoboken, New Jersey.

7.      Plaintiff Bernard A. Katz, CPA is the Debtor Representative and Liquidating Trustee under the Third Amended Plan of Liquidation of HHI confirmed by the United States District Court in HHI's Chapter 11 bankruptcy case on July 31, 2012.

8.      Defendant Holzberg was the President and Chief Executive Officer ("CEO") of HHI, a member of HHI's Board of Directors (the "HHI Board") and a member of the Board of Commissioners of the Hoboken Municipal Hospital Authority (the "Authority Board") until June of 2009.

9.      Upon information and belief, Holzberg resides at 100 Constitution Way Jersey City, New Jersey.

10.      Defendant DiVito was the Chief Financial Officer ("CFO") of HHI and a member of the HHI Board until October of 2009.

11.      Upon information and belief, DiVito resides at 38 Kanouse Lane, Montville, New Jersey.

12.      Upon information and belief, Defendant MSS is a corporation organized under the laws of the State of Nevada.  At the times relevant to the allegations of this complaint, MSS was doing business in the State of New Jersey, and DiVito was the controlling officer and shareholder of MSS.

3

13.     Defendant Hatiras was the Chief Executive Officer of HHI and a member of the HHI Board during a certain time period relevant to the allegations herein.

14.     Upon information and belief, Hatiras resides at 35 Magnolia Avenue, Jersey City, New Jersey.

15.     Defendants DeSanti, Greene and Leitner were members of the HHI Board during the relevant time period of the allegations herein (together with Holzberg, DiVito and Hatiras, the "HHI Board Defendants").

16.     Upon information and belief, DeSanti resides at 2659 Bolero Drive, Apt 2, Naples, Florida, Greene resides at 2102 Farley Road, Whitehouse Station, New Jersey and Leitner resides at 36 Ridgewood Terrace, Maplewood, New Jersey.

17.     Defendants Caulfield, Lawton, Corea, Kramer, Richardson, Roberts, Tomkins, Nestor and Tonry were members of the Authority Board during the relevant time period of the allegations herein (collectively with Holzberg, the "Authority Board Defendants").

18.     Upon and information and belief, Caulfield resides at 1125 Maxwell Lane, Apt. 524, Hoboken, New Jersey; Lawton resides at 633 Washington Street, Hoboken, New Jersey; Corea resides at 76 Bloomfield Street, Apt 8F,  Hoboken, New Jersey; Kramer resides at 1423 Graymill Drive, Scotch Plains, New Jersey; Richardson resides at 1162 W 7th Street, Plainfield, New Jersey; Roberts resides at 618 Hudson Street, 1, Hoboken, New Jersey; Tomkins resides at 151 Barkley Lane, Salem, New York; Nestor resides at 1301 Adams Street, Apt 211, Hoboken, New Jersey; and Tonry resides at 4 Wildflower Trail, Trenton, New Jersey.

19.     Defendant Hodulik & Morrison, P.A.("Hodulik") is a New Jersey professional association of certified public accountants licensed to practice accounting in New Jersey.

20.     During time periods relevant to the allegations herein, Hodulik acted as an independent auditor for HHI.

21.     Defendant McEnerney, Brady & Company, LLC ("McEnerney") is a New Jersey limited liability company staffed with certified public accountants licensed to practice accounting in New Jersey.

22.     During time periods relevant to the allegations herein, McEnerney acted as an independent auditor for HHI and the Authority.

### PROCEDURAL HISTORY[1]

23.     On August 1, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

24.     The Debtor continued to operate its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 after the Petition Date.

25.     On October 7, 2011, the Bankruptcy Court entered an order approving among other things, (i) a settlement agreement dated October 5, 2011, among the Debtor, the Authority, the City, the Hoboken Parking Utility, the Official Committee of Unsecured Creditors, and the Purchaser; and (ii) the sale and assignment to the Purchaser of the Debtor's rights and interests under certain contracts and leases necessary to operate the Hoboken University Medical Center.

26.     The sale of the Debtor's assets to the Purchaser closed on November 4, 2011, along with the sale of the hospital by the Authority to the Purchaser.

27.     On July 31, 2012, the Bankruptcy Court entered an order confirming the Debtor's Third Amended Joint Plan of Orderly Liquidation (the "Plan").

---

[1] Unless defined in this section entitled "Procedural History", capitalized terms used herein shall have the meaning ascribed to them below in the Complaint.

28.     Bernard A. Katz, CPA was appointed as the Debtor Representative and Liquidating Trustee under the Plan, which granted him standing to pursue the claims asserted in this Complaint.

29.     The "Effective Date" of the Plan as defined in Section 2.55 thereof occurred on September 12, 2012.

## FACTS

**A.      St. Mary Hospital under Bon Secours Ownership**

30.     Founded in 1863, St. Mary Hospital – the only hospital in the City of Hoboken (the "City") – was the oldest continuously operated hospital in New Jersey.

31.     In January  2000, Bon Secours New Jersey Health System, Inc. ("Bon Secours") acquired St. Mary Hospital.

32.     In January 2005, having accumulated a reported $118 million of losses in operating the hospital between 2000 and 2004, Bon Secours sought to sell the hospital, but received no offers.

33.     Faced with continuing average losses of approximately $26 million per year and no interested purchasers, in January 2006, Bon Secours filed a certificate of need application with the State of New Jersey Department of Health and Senior Services seeking authorization to close the hospital.

**B.      Creation of the Authority and the Debtor**

34.     In response to opposition from residents and after concerted lobbying efforts to save and stave off the closure of St. Mary Hospital, in July 2006, the New Jersey Legislature adopted the New Jersey Municipal Hospital Authority Law, N.J.S.A. §30:9-23.15, et seq. (the "MHAL"), which authorized a New Jersey municipality meeting certain criteria to create a hospital authority for the purpose of owning and operating a hospital.

35.     The purpose of the MHAL was to allow the City to take over the otherwise insolvent and unmarketable St Mary's hospital in conjunction with an infusion of public funds.

36.     The Hoboken Municipal Hospital Authority (the "Authority") was formed on August 9, 2006 pursuant to the MHAL and an ordinance of the City to prevent the City from losing its only hospital through the Authority's acquisition of the hospital from Bon Secours.

37.     The Authority consists of 11 members - one Class I member, two Class II hospital members, six Class III public members and two Class IV members.

38.     The Class I member is the Mayor of the City or his designee, ex-officio.

39.     The Class II hospital members serve on, and are appointed by, the medical staff executive committee of the hospital.

40.     The Class III public members are appointed by the Mayor of the City, with the advice and consent of the City Council.

41.     At least four of the Class III public members must be residents of the City.

42.     At least two of the Class III public members must have special expertise as follows: one must have extensive expertise in finance of private or nonprofit organizations, and one must have extensive expertise in nonprofit organizational management.

43.     The hospital's chief executive officer or his designee serves as a non-voting Class IV member and the Commissioner of Community Affairs of the State of New Jersey appoints one individual as a non-voting Class IV member.

44.     Pursuant to an Asset Transfer Agreement, Bon Secours transferred all of the assets comprising the hospital to the Authority in consideration of $1.

45.     In addition to essentially a free transfer of the hospital's assets to the Authority, Bon Secours also contributed $13 million to the Authority for the hospital's working capital in connection with the transfer.

46.     Upon the closing of the transaction, on or about February 1, 2007, the Authority changed the name of the hospital from St. Mary Hospital to Hoboken University Medical Center.

47.     The Authority became the owner of the hospital pursuant to N.J.S.A. §30:9-23.18, and the holder of the necessary regulatory approvals from the State (including the certificate of need and license) and the owner of the right to use the hospital's Medicare and Medicaid provider numbers.

48.     The MHAL mandates that "[t]he authority shall exercise its powers and duties to manage and operate a hospital owned by it through a contract or contracts with a manager," but it makes clear that "the primary responsibility of operating the hospital shall remain that of the authority."  N.J.S.A. § 30:9-23.20(a).

49.     The MHAL, among other things, also requires that the authority "adopt a management plan for the hospital, including monitoring and review methods of financial activities" and "form a finance committee, which shall be responsible for the oversight of the finances of the authority, and delineate the duties and obligations of the finance committee." N.J.S.A. § 30:9-23.20(e)(1), (4).

50.     In accordance with the MHAL, the Authority caused the Debtor to be formed as a not-for-profit corporation and a support organization, as defined in Sections 501(c)(3) and 509(a)(3) of the Internal Revenue Code of 1986, to manage and operate the hospital on the Authority's behalf.

C.   **HHI's By-Laws**

51.   Pursuant to the requirements of the MHAL, the Debtor's By-Laws (the "By-Laws") at Article III thereof, expressly reserved to the Authority, , extensive control over every significant aspect of the Debtor's corporate existence, including:

- To approve the individuals that the [Debtor] proposes to designate as the Chief Executive Officer and the Chief Financial Officer of the municipal hospital managed by the [Debtor]; to remove such individuals form office, and to approve contracts or other arrangements setting forth terms and conditions of employment for those positions.

- To approve the management plan for the municipal hospital to be operated by the Authority, including monitoring and review methods of financial activities.

- To approve the minimum provisions that shall be set forth in the [Debtor's] management contract with the Authority.

- To approve and monitor the annual budgets of the municipal hospital operated by the Authority and of the [Debtor] and any amendments thereto.

- To authorize the [Debtor] to engage in or enter into any transaction providing for the acquisition or disposition of the assets of the municipal hospital operated by the Authority, unless authorized in the municipal hospital's annual budget.

- To approve the incurrence of debt or expenses by the municipal hospital operated by the Authority, unless authorized in the municipal hospital's annual budget.

52.   The By-Laws further required HHI's board to conduct regular meetings.

53.   Pursuant to the By-Laws, the Authority controlled the appointment and removal of two (2) of the five (5) members of the Debtor's board of directors.

54.   The Debtor's By-Laws at Article IV, Section 3 provided that "the Directors who serve by virtue of their service as President and Treasurer/Chief Financial Officer of the Corporation shall be approved by the Authority and shall serve until they resign or are removed by the Authority."

55.     Further, at Article VI, Section 10, the Debtor's By-Laws provided that: "[n]o officer shall have the authority to enter into any contracts, obligations or undertakings on behalf of [the Debtor] in any matter unless the same are within the expenditure limits for various budget categories approved by the Authority in the annual budget."

56.     The Authority's control and supervision of the key functions of the Debtor is also reflected in the Master Manager and Operator Agreement (the "Manager Agreement") dated as of February 1, 2007, and entered into by the Authority and the Debtor pursuant to the MHAL, including:  (i) approval of the appointment of the Chief Executive Officer and Chief Financial Officer and their respective compensation (Manager Agreement, Section 2.2.8); (ii) approval of the Proposed Annual Business Plan and Budget (Id. at Sections 4.1 and 4.2); access to and inspection of all books and records and financial data (Id. at Section 4.5); monthly, quarterly and annual reporting from the Debtor to the Authority reflecting financial results of the hospital's operations (id. at Section 4.6); and control of the acquisition and disposition of assets, the incurring of debts and expenses and the taking on of liabilities not normally associated with the day-to-day operation of a hospital (Id. at Section 2.1.2).

**D.     <u>The Manager Agreement</u>**

57.     Pursuant to the Manager Agreement at Section 2.2, the Debtor was generally required to "perform all the duties necessary to supervise, direct and control the day-to-day operation of the Facility … directly contract for services necessary for the day-to-day operation of the Facility, and … operate the Hospital as a general acute care hospital."

58.     Among other things, under the Manager Agreement, the Debtor was responsible for negotiating and entering into contracts with physicians (Sections 2.2.1, 2.2.2), vendors and suppliers (Section 2.2.23), and other service providers (Section 2.23.); entering into collective bargaining agreements (Section 2.2.6); coordinating billing and collection services on behalf of

the Authority (Section 2.2.11); preparing and maintaining accounting and budget cycles, including the Annual Business Plan and Budget of the Debtor (Sections 2.2.14, 2.3.14, 2.3.17 and 4.1 - 4.6); and maintaining the hospital's physical plant (*id.* at Section 2.2.15).

59.     The Authority was responsible for reimbursement of all expenses incurred by the Debtor in carrying out its duties and obligations under Section 2.2.8 of the Manager Agreement.

60.     The Manager Agreement required at Section 2.1.3. that, on the first business day of each month, the Authority transfer from the Operating Fund established pursuant to the Trust Indenture (as defined below) to the Debtor's operating account one twelfth of the Annual Business Plan and Budget approved by the Authority, as adjusted in accordance with the monthly reports consisting of unaudited financial statements which the Debtor was required to furnish to the Authority.

61.     HHI was required under Section 2.2.11 and 7.2 of the Manager Agreement, through subcontractors, to arrange all billing and collection for the hospital's services on behalf of the Authority and to supervise the deposit, in the name of the Authority, of all funds received form the operation of the hospital into the Revenue Fund established pursuant to the Trust Indenture (as defined below).

62.     The Manager Agreement made it clear that all revenues received by the hospital belonged to the Authority and that HHI had no access to such funds, except for the portion thereof transferred by the Authority to HHI's operating account in accordance with approved budgets.

63.     Thus, the MHAL established a structure whereby the Authority would own the hospital and all revenues related thereto, while the Debtor would incur all the costs and expenses of operating the hospital and would be reimbursed for such costs and expenses by the Authority.

64.     The Debtor had no assets, except for the right to be reimbursed by the Authority for the expenses incurred in operating the hospital pursuant to the Manager Agreement.

**E.      Agreements for the Services of CEO and CFO of HHI**

65.     On or about February 1, 2007, the Debtor entered into an agreement with Harvey A. Holzberg, LLC to provide the services of Holzberg as the chief executive officer of the Debtor.

66.     On or about February 1, 2007, the Debtor entered into an agreement with Medical Support Systems, Inc. to provide the services of DiVito as the chief financial officer of the Debtor.

67.     Both of these consulting agreements contained incentive payment provisions based on the financial performance of the hospital.

**F.      The Business Plan**

68.     Upon information and belief, through an entity called, "Holzberg & DiVito Consultants," Holzberg and DiVito acted as consultants to the City and/or the Authority in connection with the acquisition of the hospital by the Authority and the development of a business plan for the operation and financial turnaround of the hospital going forward

69.     Holzberg and DiVito, by and through Holzberg & DiVito Consultants, prepared a City of Hoboken Municipal Hospital Authority Business Plan (the "Business Plan"), dated May 31, 2006.

70.     The Business Plan was reviewed by the Authority Board and the New Jersey Local Finance Board.

71.     The Business Plan, which included five years of operating and financial projections (2007-2011), contemplated achieving a financial turnaround of the hospital primarily through (i) increasing patient revenues, (ii) the Authority's eligibility for increased

Disproportionate Share Hospital ("DSH") payments from the State of New Jersey as a result of the transfer of the hospital's ownership to a municipal authority, and (iii) reducing costs.

72.     Under the Business Plan, the increase in patient demand and the corresponding increase in revenue was premised on the upgrades to the hospital's existing physical plant and a construction of a new emergency department.

73.     Such capital improvements were also expected to increase the support of the hospital among local physicians.

74.     The financing of the capital improvements was to come from the issuance of bonds by the Authority guaranteed by the City.

75.     The Business Plan contemplated a financing of $52 million, to include $33 million of equipment purchases and renovations, with the remainder allocated to a debt service reserve fund and bond issuance costs.

76.     The Business Plan assumed that the Authority would be eligible to receive an additional $15.8 million of DSH payments for several years and a one time State appropriation of $4 million, both as a result of the ownership transfer to the Authority.

77.     The Business Plan stated at page 21 that "[t]he City and the manager believe that such an increase in DSH payments, the expansion of certain operations and cost savings will result in revenues exceeding expenses within several years."

78.     The financial model set forth in the Business Plan also assumed a $13 million gift from Bon Secours as part of the transfer of ownership to the Authority.

79.     The Business Plan stated at page 26 that "[t]he DSH payments are assumed to be sufficient to economically stabilize the organization and facilitate the financing of $52 million bonding for technological and facility improvements."

80.     However, the Business Plan also anticipated that the DSH payments would be reduced or eliminated after fiscal year 2009 as patient volumes were projected to increase.

81.     With respect to liquidity assumptions, the Business Plan model included at page 27 a provision for working capital financing of $5 million (plus $4 million reserves) for 90 days through Authority bond issuance, which was expected to be repaid in the first two years of operations.

82.     The Business Plan anticipated that the accounts receivable billing and collection cycle would remain static during the projection period at 45 days.

83.     The Business Plan anticipated that the accounts payable payment cycle would remain static during the projection period at 33 – 45 days.

84.     Holzberg, DiVito, the HHI Board and the Authority Board were well aware that under Bon Secours' ownership the hospital realized average net losses of approximately $26 million per year.

85.     Based on the assumptions made by Holzberg and DiVito, the Business Plan projected that under the Authority's ownership the hospital would realize income from operations in every year covered by the Business Plan:

| Year | Projected Income From Operations* |
|------|-----------------------------------|
| 2007 | $4.2 million |
| 2008 | $3.753 million |
| 2009 | $6.541 million |
| 2010 | $5.361 million |
| 2011 | $3.944 million |

*Operating income less depreciation before non-operating income (loss).

86.     Thus, the Business Plan projected that in the first year of operating the same hospital, simply under a different name, the hospital would achieve a financial turnaround of approximately $30 million compared to the average historical financial results experienced by Bon Secours.

87.     At the Authority's Board meeting on November 8, 2006, members of the public and members of Hoboken's City Council questioned the viability of the plan for the Authority to acquire and operate profitably.

88.     In response, the then Chairman of the Authority, James Caulfield, stated that "if this facility is not run profitably within a few years then it will be closed."

89.     Nevertheless, neither Mr. Caulfield nor any other Defendants ever followed through with Mr. Caulfield's commitment.  Instead, the Defendants failed to fulfill their duties to monitor the hospital's operations, familiarize themselves with the hospital's finances (including measuring its actual performance against the lofty projections set forth in the Business Plan), and take appropriate action based upon the financial condition.

## G.     The Authority's 2007 Bond Issue

90.     To finance renovations and other capital improvements to the hospital and to provide the hospital with working capital, the Authority issued approximately $51.635 million in revenue bonds in 2007 (collectively, the "2007 Bonds").

91.     The terms and conditions of the 2007 Bonds were set forth in an Indenture of Trust, dated as of February 1, 2007 (the "Trust Indenture"), between the Authority and TD Bank, N.A. (as successor-in-interest to Commerce Bank, N.A.) and certain supplemental indentures.

92.     The 2007 Bonds consisted of $40,465,000 of City of Hoboken Guaranteed Hospital Revenue Bonds Series 2007A (Federally Taxable)(Convertible to Tax-Exempt) (the

"Series 2007A Bonds") and $11,170,000 of City of Hoboken Guaranteed Hospital Revenue Bonds, Series 2007B (Federally Taxable) (the "Series 2007B Bonds").

93.    Pursuant to the Trust Indenture, the Series 2007A Bonds were issued for the purpose of providing funds for: (A)  the acquisition of various capital improvements and fixed and major moveable equipment for the hospital, including: (i) renovation of patient rooms, (ii) construction of a new 20,000 square feet emergency department, (iii) renovations and expansion of labor and delivery suite, (iv) information system integration and backup capacity – tandem servers, (v) construction and acquisition of a low risk cardiac catheterization laboratory and equipment, and (vi) purchase of 64 Slice CT imaging equipment and other moveable medical equipment, (B) the acquisition by the Authority of land and a 25,565 square foot building located at 122-132 Clinton Street, Hoboken, New Jersey to be used as a clinic, physician offices and training facility, (C) the acquisition by the Authority of land and a 5,300 square foot building located at 307 Willow Avenue, Hoboken, New Jersey to be used as counseling and administrative offices to house a County and Federally grant funded AIDS program, (D) the construction of leasehold improvements to the ground floor of the garage facility owned by the City located at 4th Street and Willow Avenue, Hoboken, New Jersey, to be used by the Authority for hospital office facilities, (D) capitalized interest on the Series 2007A Bonds for a period of two years, (E) the funding of a deposit to a debt service reserve fund for the Series 2007A Bonds, and (F) the payment of costs of issuing the Series 2007A Bonds (the "Series 2007A Project").

94.    The Series 2007B Bonds were issued for the purpose of (i) providing capitalized interest on the Series 2007B Bonds for a period of two years, (ii) providing $5 million initial start-up working capital and $5 million operating reserves for operation of the hospital, and (iii)

paying costs of issuing the Series 2007B Bonds (the "Series 2007B Project" and, collectively with the Series 2007A Project, the "Project").

95.     The 2007 Bonds were secured by all Revenues (as defined in the Trust Indenture) generated by the Authority in owning and operating the hospital.

96.     The Debtor was not an obligor on the 2007 Bonds.

97.     The City unconditionally guaranteed payment of the 2007 Bonds pursuant to an ordinance adopted on January 3, 2007 catalogued as City of Hoboken Ord. No. DR-281.

98.     The Trust Indenture provided for the priority of distributions of the hospital's Revenues by the Trustee.

99.     On the 1st business day of each month, the Trustee was to make payments out of the moneys in the Revenue Fund (the lockbox) in the following order:

A.     First, into the respective accounts within the Debt Service Fund;

B.     Second, to the Authority for deposit into the Operating Fund for payment of the Authority's Operating Expenses in accordance with its Annual Budget;

C.     Third, into the respective accounts within the Debt Service Reserve Fund;

D.     Fourth, To the Authority for deposit into the Operating Reserve Fund, an amount equal to 1/12 of the amount necessary, if any, to increase the amount which is on deposit in the Operating Reserve Fund such that the funds on deposit in the Operating Reserve Fund is equal to the Operating Reserve Fund Requirement;

E.     Fifth, into the Capital Replacement Fund; and

F.     Sixth, to the City, to the extent required to reimburse the City for amounts theretofore advanced by the City pursuant to the City Guaranty.

**H.**   **HHI Begins Running the Hospital**

100.   On February 1, 2007, the Authority became the owner of the hospital, which began operating under a new name – Hoboken University Medical Center – under the management of HHI.

101.   On or about February 1, 2007, Holzberg became the CEO with a salary of approximately $800,000 plus other incentives.

102.   The hospital began operating under the Authority's ownership and HHI's management with no outstanding accounts payable.

103.   Contemporaneously with the commencement of operations under the Authority's ownership, the hospital received one time working capital infusions of $13 million from Bon Secours, $4 million from the State of New Jersey and $5 million of working capital from 2007 Bonds.

**I.**   **Holzberg's and DeVito's Inaccurate Reporting and Insolvency of HHI**

104.   The Business Plan prepared by Holzberg and DiVito had projected income from operations of $4.2 million from the hospital's operations in 2007.

105.   At the conclusion of 2007, an internal financial report prepared by Holzberg and DiVito reflected that the hospital realized income from operations for 2007 (11 months) of $1.585 million.

106.   At the January 23, 2008 meeting of the Authority Board, Holzberg and DiVito reported to the Authority Board that the results for the year ending December 31, 2007 were a $10.5 million "profit" before reserves of $1.5 million.

107.   In reality, an audit conducted by the Authority's auditor, McEnerney, in May 2008, revealed that in 2007, the hospital realized a loss from operations of $4.019 million.

108.    Thus, Holzberg and DiVito overstated the results of the hospital's operations for 2007, both internally and to the Authority Board, by millions of dollars.

109.    No HHI or Authority Board Defendant questioned or challenged any reporting that the hospital's operations suddenly became profitable in 2007 after having experienced losses of  tens of millions of dollar in prior years.

110.    The Business Plan had projected accounts payable and accrued expenses of HHI at year end 2007 of $11.264 million.

111.    In reality, the actual accounts payable and accrued expenses of HHI at the end of 2007 equaled $14.291 million – approximately $3 million higher than the Business Plan projection.

112.    No HHI or Authority Board Defendant questioned, challenged or otherwise inquired why or how accounts payable and accrued expenses exceeded the Business Plan by in excess of 20% in 2007.

113.    The increase in payables in 2007 was one of many red flags of the financial problems that plagued HHI which should have triggered further inquiry.

114.    However, despite the red flags, the HHI and Authority Board Defendants failed to make any effort to inform themselves of the financial circumstances and deteriorating financial condition of the hospital or to consider appropriate remedial action.

115.    The lack of proper oversight by the HHI and Authority Board Defendants allowed the HHI management to continue funding the hospital's losses at the expense of HHI's creditors by using the growth of accounts payable as a source of financing.

116.    The McEnerney audit of the Authority's 2008 financials, published in 2009, revealed that Holzberg and DiVito had consistently overstated the value of the hospital's assets (including accounts receivable) by failing to apply appropriate discounts for collectability.

117.    Based in part on such overstatements, while ignoring the many red flags, and with little or no inquiry, the Authority approved budgets that contained projected expenses that were not supportable by revenues.

118.    Neither Holzberg nor DiVito nor any other Defendant "trued up" incurred actual expenses with receivables actually collected.

119.    Financially unrealistic operations based on overstated accounts receivable and revenue were permitted to continue because of  a complete lack of oversight by the Defendants and their failure to impose appropriate financial controls or checks.

120.    No Defendant questioned or challenged the growth of the Debtor's payables and the receivable due from the Authority.

121.    No Defendant questioned or otherwise challenged the solvency or insolvency of either the Debtor or the Authority.

122.    The Authority was HHI's sole source of payment for the expenses HHI incurred by purchasing goods and services necessary to operate the hospital.

123.    The Authority's source of funding for the hospital's operating expenses was the revenues of the hospital.

124.    The overstatement of projected revenues and inflated budgets, which the HHI and Authority Boards failed to question; despite circumstances crying out for such questions, caused HHI to incur debts that it had no ability to repay, rendering HHI insolvent virtually from its inception.

125.    HHI was also insolvent under a balance sheet test shortly after the inception of its operations, after the initial cash infusions of working capital were exhausted.

126.    HHI's only asset – the account receivable due from the Authority – in theory, should have had at least the same value as its liabilities – accounts payable to HHI's creditors.

127.    However, because of the overstatement of the hospital's revenue projections, the full value of the accounts receivable due from the Authority reflected on HHI's balance sheet was not collectible.

128.    Therefore, HHI's liabilities exceeded the value of HHI's assets, rendering HHI insolvent.

129.    Despite starting from a clean slate of accounts payable and receiving $22 million in one-time cash infusions in 2007, Holzberg and DiVito were unable to operate the hospital at a break-even level, let alone achieve operating income of $4.2 million that they projected in the Business Plan for 2007.

130.    However, the one-time cash infusions received by the Authority in connection with the transfer of the hospital from Bon Secours masked the operating losses sustained by the hospital in 2007.

131.    The hospital's inaugural loss of approximately $4 million coupled with rapidly growing accounts payable and accrued expenses, which HHI had no means of repaying, put HHI on an unsustainable trajectory of deepening insolvency.

132.    No Board Defendant took any action to understand the finances of the Authority or HHI to question, monitor, challenge or otherwise scrutinize the facially unrealistic financial results provided to them by Holzberg and/or DiVito.

133.    Despite actual knowledge of the hospital's historical systemic problems, dating back to Bon Secours' ownership, there was no supervision of the finances or financial policies of HHI or the Authority by any of the Defendants.

134.    The depletion of the $22 million in one-time cash infusions in eleven (11) months of operations and material deviation from the Business Plan were red flags of financial distress that were ignored by the Defendants.

135.    Had any HHI Board or Authority Board Defendants been monitoring the results for 2007, such defendant would have discovered:

| *Numbers in thousands* | 2007 Business Plan Projections | | HUMA and HHI Audit YTD 11 Months - 12/31/2007 | | Variance | |
|---|---|---|---|---|---|---|
| Operating Revenues: | | | | | | |
| Net patient service revenue less bad debt | $ | 93,859 | $ | 86,206 | $ | (7,653) |
| Other operating revenue | | 38,985 | | 37,356 | | (1,629) |
| Total operating revenue | $ | 132,844 | $ | 123,562 | $ | (9,282) |
| Operating expenses | | 127,859 | | 123,451 | | (4,408) |
| Operating income (loss) before depreciation | $ | 4,985 | $ | 111 | $ | (4,874) |
| Depreciation and Amortization | | 785 | | 4,130 | | 3,345 |
| **Income (loss) from Operations** | $ | 4,200 | $ | (4,019) | $ | (8,219) |
| Non-operating Income (losses) | | 500 | | (611) | | (1,111) |
| **Net income** | $ | 4,700 | $ | (4,630) | $ | (9,330) |

136.    HHI's downward spiral continued and rapidly accelerated in 2008.

137.    For 2008, the Business Plan projected income from operations of $3.753 million. The annual budget for 2008 prepared by Holzberg and DiVito and approved by the Authority Board projected income from operations of $2.342 million.

138.    The actual results of the hospital's operations in 2008 were drastically different from the projections.

139.    An internal financial report prepared by Holzberg and DiVito reflected that in 2008, the hospital realized a $8.877 million loss from operations.

140.    At the January 28, 2009 meeting of the Authority Board, DiVito reported that, for the 12 months of 2008, the hospital sustained a loss from operations of $4.3 million.  DiVito reported the same loss for 2008 to the HHI Board earlier the same day.

141.    In fact, an audit of 2008 financial statements conducted by McEnerney in 2009 revealed that the hospital's loss from operations was $22.289 million, far more than the previously reported $4.3 million or even the internal  $8.877 million figure.

142.    Thus, the hospital's actual loss from operations in 2008 was understated by approximately $13.5 million in the internal reports, and by approximately $18 million in the information which had been provided to the HHI and the Authority Boards in January of 2009.

143.    The Business Plan projected accounts payable and accrued expenses of HHI at year end 2008 of $11.841 million.

144.    In reality, the actual accounts payable and accrued expenses of HHI at the end of 2008 equaled $19.073 million – approximately $7.2 million higher than the Business Plan projection.

145.    Year over year, the accounts payable grew by approximately $4.8 million - from $14.291 in 2007 to $19.073 in 2008 – which represented an increase of almost 34%.

146.    The HHI and Authority Board Defendants took no action to make themselves aware of the acute and grave financial condition of the hospital in 2008.  Instead, ignoring the circumstances and the many red flags, they simply accepted the statements of Holzberg and DiVito at face value.

147.   HHI had no ability to satisfy the mounting accounts payable, and the hospital continued to operate and accrue losses at the creditors' expense.

148.   Making matters even worse, the State of New Jersey did not allocate any stabilization grant funds to the Authority in 2008 because the State believed that the hospital did not need such financial assistance based on the grossly inaccurate positive financial results reported by Holzberg and DiVito.

149.   In 2009, the hospital realized a loss from operations of $14.280 million, whereas the Business Plan had projected income from operations for that year of $6.541 million, and the annual budget had projected a loss of $3.26 million.

150.   The following chart demonstrates the difference between projected results under the Business Plan and the actual operating results:



151.   The accounts payable at 2009 year end grew to $31.491 million – a 65% increase year over year.

152.    The Business Plan had projected accounts payable at 2009 year end of only $12.444 million, which was approximately $19 million less than the actual amount.

153.    In 2010, the hospital realized a loss from operations of $1.154 million and the accounts payable grew to a staggering $36.911 million.

154.    After five years of operating the hospital, having accrued cumulative losses from operations during that period in excess of $40 million, HHI filed for bankruptcy on August 1, 2011.

155.    Holzberg's and DiVito's inaccurate reporting of HHI's and the hospital's financial  condition, coupled with the failure of the HHI Board and the Authority Board Defendants, to exercise any meaningful oversight, caused HHI's creditors to lose millions of dollars.

**J.      Holzberg's and DiVito's Inaccurate Reporting in Connection with the 2008 Bond Refinancing**

156.    In April 2008, Holzberg and DiVito informed the Authority Board that a substantial reduction in DSH funding was expected for 2008 and 2009.

157.    To compensate for the loss of DSH funding and/or to cover the losses from operations during the hospital's operations, Holzberg and DiVito urged the Authority to seek a refinancing of the Series 2007B Bonds through the issuance of the Series 2008 Bonds in the amount of  $9,720,000 (Federally Taxable) (the "Series 2008 Bonds").

158.    The purpose of the refinancing was to make certain previously restricted reserves established under the Series 2007B Bonds available for capital projects available for working capital.

159.    At the Authority Board meeting held on May 28, 2008, DiVito advised the board that "[w]ithout the refinancing, the Accounts Payables will continue to expand.  Vendors could put HUMC on credit hold, require cash or prepay, and increase the cost of goods and services."

160.    Despite this red flag of financial distress, no Authority Board Defendant questioned the financial condition of the hospital, the operations of the Authority and/or the statements by Holzberg and DiVito that the hospital was profitable.

161.    At the HHI Board meeting held on September 4, 2008, Holzberg reported that "we are doing very well and expects [sic] a margin at year-end . . . Our cash flow will improve with the restructuring of the Bonds."

162.    At the same meeting, DiVito stated "the Offering Statement reflects that we can handle the debt service . . . we experienced a $500,000 margin at July 31st."

163.    The Official Statement accompanying the Series 2008 Bonds documents distributed to the prospective investors described the purpose of the refinancing and indicated that, without the refinancing, the Authority would not have sufficient working capital for the operations of the hospital:

> The Authority's Fiscal Year 2008 operating budget of $135,679,739 anticipated $28.2 million of projected operating grants and subsidies (the "State Support") from the State of New Jersey (the "State"). However, due to the severe financial condition of the State during its fiscal year ended June 30, 2008, the State was only able to provide the Authority with $9.1 million of State Support prior to June 30, 2008. As a result, the Authority has expended the full amount of working capital and working capital reserves financed by the Series 2007 Bonds (described below) to offset this reduction in State Support, *resulting in the projection of an insufficiency of current revenues to meet ongoing monthly operating expenses. The restructuring of the Authority's debt and receipt of proceeds from the sale of the 2008 Bond will provide the Authority with available working capital for the operations of the Hospital.* (emphasis added).

164.    Once again, the Defendants were oblivious to an overt red flag of financial problems.

165.    Exhibit A-17 of the Appendix accompanying the Official Statement was intended to describe the historical financial performance of the hospital for the prospective Series 2008 Bonds investors.

166.    Exhibit A-17 included a summary of the Hospital's Revenues, Expenses and Changes in Net Assets for the eleven months ended December 31, 2007, and the seven months ended July 31, 2008.

167.    The summary indicated that, for the seven months ended July 31, 2008, the hospital realized a loss from operations of $591,873.

168.    A footnote in the summary indicated that the information with respect to the results of the hospital's 2008 operations was provided by HHI.

169.    The McEnerney audit of HHI's 2008 financial statements revealed that the hospital actually experienced a loss from operations for 2008 equal to $22.289 million.

170.    Assuming such annual loss had been incurred on a pro rata basis, applying it to the seven months of the hospital's operations ended July 31, 2008 implies that for the seven months of 2008, the hospital's actual operating loss was approximately $12.9 million.

171.    The hospital's implied operating loss of approximately $12.9 million for that period was approximately twenty one times greater than the $591,873 loss reported by Holzberg and DiVito on behalf of HHI.

172.    Had the bondholders received accurate financial information regarding the size of the hospital's operating losses in 2008, the Authority would likely have not been able to refinance the Series 2007B Bonds and obtain access to additional working capital.

173.    Had the Authority not been able to obtain access to additional working capital through the Series 2008 Bonds, it would have likely been forced to take action to sell or close the hospital in 2008.

174.    Instead, the hospital continued to operate and HHI's insolvency continued to deepen for another three years, and increasing the indebtedness owed to HHI's creditors by millions of dollars.

175.    The Defendants' failure to perform their duties caused the trade payables to increase to the detriment of HHI and its creditors.

**K.    DiVito's Delay of Publication of Authority's 2008 Audit**

176.    Upon information and belief, in early 2009, McEnerney informed DiVito that its audit of the Authority's 2008 financial statements raised a number of substantial issues as to the accuracy of the reporting of the hospital's financial results, including Holzberg and DiVito's practices for recognition of revenue.

177.    Holzberg resigned as HHI's chief executive officer in June 2009, but the Authority allowed him to remain as a consultant through the end of 2009.

178.    DiVito spent months delaying the delivery of the audit and attempting to, among other things, persuade McEnerney to change its conclusions.

179.    Ultimately, the audit was delivered to the HHI and the Authority Boards in October 2009.

180.    The audit revealed that the loss from operations in 2008 was $22.3 million, which stood in stark contrast to the $4.3 million loss that Holzberg and DiVito had reported to the HHI Board and the Authority.

181.    DiVito was relieved of his duties as HHI's chief financial officer immediately upon the disclosure of the audit results to the HHI Board on October 27, 2009, but the HHI

Board continued to pay him consulting fees through, at least, the end of his contract on May 1, 2010.

182.    After the publication of the audit, the Authority caused HHI's new management to implement certain corrective measures, including substantial reductions of expenses.

183.    Had DiVito not caused a delay of the audit results, and/or had the HHI and Authority Board Defendants insisted on receiving the audit results earlier, corrective measures could have been taken sooner to mitigate the losses being suffered by HHI's creditors.

184.    Moreover, the delay in the delivery of the audit may have facilitated the Authority's ability to refinance the Series 2008 Bonds which matured on May 1, 2009, as set forth in more detail below.

185.    In the absence of the delay, the disclosure of the actual $22.3 million operating loss realized by the hospital in 2008 in the bond refinancing solicitation materials disseminated in early 2009 would have likely precluded the refinancing and caused the Authority to default under the Trust Indenture.

186.    The default would have forced the Authority and the City to take measures to close or sell the hospital, preventing further deepening of HHI's insolvency to the detriment of its creditors.

**L.    Maturity of Series 2008 Bonds and Issuance of Series 2009 Bonds**

187.    The Series 2008 Bonds in the principal amount of $9,720,000 were due to mature on May 1, 2009.

188.    In early 2009, the Authority went to the market to obtain financing to repay the Series 2008 Bonds.

189. Among the disclosure materials distributed to prospective bondholders was a description of historical financial performance attached as Exhibit A-18 to the Appendix of the Official Statement.

190. Exhibit A-18 included unaudited financial results of the hospital's operations for 12 months ended December 31, 2008, which stated that the hospital realized a loss from operations of $8.876 million in 2008.

191. It is unclear why the amount of the operating loss for 2008 provided to the prospective bondholders appeared to be more than double the amount of the $4.3 million operating loss for 2008 that Holzberg and DiVito reported to the HHI Board and the Authority Board on January 28, 2009.

192. The amount of the operating loss disclosed to the prospective bondholders was, nevertheless, two and a half times smaller than the actual loss from operations of $22.3 million experienced in 2008, as revealed by the McEnerney audit.

193. The Authority issued $9,720,000 of the aggregate principal amount of City of Hoboken Guaranteed Hospital Revenue Bonds, Series 2009 (Federally Taxable) (the "Series 2009 Bonds") and used the proceeds thereof to repay the maturing $9,720,000 of the Series 2008 Bonds.

194. If Holzberg and DiVito had not inaccurately reported the size of the hospital's operating losses experienced in 2008 and/or if the HHI Board Defendants or Authority Board Defendants had exercised care in the exercise of their duties, the Authority likely would have been unable to refinance the Series 2008 Bonds that were due to mature in May 2009.

195.    The failure to repay the Series 2008 Bonds at maturity would have constituted an event of default under the Trust Indenture and caused the Indenture Trustee to exercise appropriate remedies against the Authority and the City, as the guarantor of the bonds.

196.    The City and the Authority would have been forced to take action in 2009 to sell the hospital as a going concern or close it and sell the underlying real estate to satisfy the debt owed to the bondholders.

197.    Such steps would have prevented any further deepening of HHI's insolvency and diminished the losses suffered by HHI's creditors.

**M.    HHI Board Defendants' Failure of Oversight**

198.    While the hospital suffered more than $26 million in aggregate operating losses during 2007 and 2008, the HHI Board members were asleep at the switch.

199.    The HHI Board had actual knowledge of the fact the hospital lost an average of $26 million per year under Bon Secours' ownership.

200.    Despite knowing that they were taking over management of such a deeply distressed institution that had been on the brink of closure, the HHI Board members failed to observe the most basic tenets of corporate governance – regular board meetings and review of monthly, quarterly and annual financial statements and asking questions about obvious anomalies and unrealistic numbers and projections.

201.    The HHI By-Laws required the board to conduct regular meetings.

202.    However, the HHI Board met only three times in 2007 and two times in 2008.

203.    In fact, the HHI Board did not start holding regular board meetings, with financial statements distributed for such meetings, until October 2009.

204.    Only two board meetings, which were 10 months apart, took place in 2007 after the acquisition of the hospital from Bon Secours.

31

205.     Those meetings together lasted a total of two hours and thirty seven minutes.

206.     The HHI Board held its first meeting on January 27, 2007 – prior to the February 1, 2007 commencement of the hospital's operations under the Authority's ownership.

207.     At that meeting, Holzberg informed the board of the financial distress of St. Mary Hospital, its losses of $26 million in recent years, Bon Secours' unsuccessful effort to sell the hospital to UMDNJ, the formation of the Authority to save the hospital from closure, the issuance of bonds by the Authority for capital improvements and the contributions from Bon Secours and the State of New Jersey in connection with the transfer of ownership.

208.     The minutes of the January 27, 2007 meeting reflect that DiVito distributed the "Calendar 2007 Operating Budget" for the Authority and HHI.  DiVito and HHI's legal counsel informed the board that HHI would incur all costs associated with operating the hospital, which would be reimbursed by the Authority, as HHI would not own the revenues generated by the hospital.

209.     The minutes of the January 27, 2007 meeting do not reflect any discussion by Holzberg or DiVito of the specifics of the budget distributed to the HHI Board members, any questions regarding the line items in the budget from the HHI Board members, any questions as to how the HHI management planned to turn around a hospital that was losing $26 million per year, or whether the hospital could operate on a break-even basis long term without the one-time contributions obtained from Bon Secours and the State of New Jersey in connection with the ownership transfer.

210.     The next meeting of the HHI Board did not take place until October 10, 2007 – eight months after HHI began managing the hospital on February 1, 2007.

211.    The meeting lasted twelve (12) minutes and focused on the resolutions regarding the retention of an insurance broker and complying with a request from an IRS examiner.

212.    The minutes of the October 10, 2007 meeting do not reflect any presentation of financial reports, any discussion of the hospital's financial performance or the financial condition of HHI.

213.    The final meeting of the HHI Board during 2007, took place on December 11, 2007.

214.    The meeting lasted two hours and twenty five minutes.

215.    Almost the entire December 11, 2007 meeting was dedicated to resolutions regarding a 401K plan, an incentive compensation program for senior managers and administrators, the hospital foundation and modifications to Holzberg's and DiVito's contracts required by the IRS.

216.    The minutes of the December 11, 2007 meeting reflect, in the "Miscellaneous" section, that DiVito reported that "we showed approximately a $10.5 million margin at the end of November."

217.    No financial statements were provided to the HHI Board to corroborate DiVito's assertion that the hospital was operating profitably, and none were requested by any of the HHI Board members.

218.    DiVito also informed the HHI Board that the hospital received $3 million less than anticipated of the DSH funds and that "it is hopeful that we will receive a DSH payment to approximate $10-11 million for the period July 1, 2008 through June 30, 2009."

219.    The HHI Board members did not question the impact of the $3 million reduction in DSH payments on the hospital's financial performance in 2007 or how the hospital would be

impacted if the "hope" of receiving $10-11 million in DSH payments for the period July 1, 2008 through June 30, 2009 did not materialize.

220.    The pattern of HHI Board's neglect continued in 2008.

221.    In 2008, the HHI Board held two board meetings – one in April and the other in September.

222.    The two meetings together lasted seventy (70) minutes.

223.    The HHI Board meeting on April 30, 2008 lasted thirty minutes.

224.    At the April 30, 2008 meeting, the HHI Board: (i) approved audited financial statements of HHI for 2007 based on the audit conducted by Hodulik and (ii) approved the incentive compensation payable to Holzberg and DiVito and modifications of their consulting agreements.

225.    The minutes of the April 30, 2008 reflect no questions from or discussion among the HHI Board members regarding the 2007 financial statements.

226.    The minutes of the April 30, 2008 reflect no questions from or discussion among the HHI Board members regarding the audit by Hodulik.

227.    The audited financial statements presented at the April 30, 2008 meeting reflected an operating loss of $278,910.

228.    The HHI Board members failed to question Holzberg or DiVito as to why HHI experienced an operating loss when the Business Plan projected income from operations of the hospital of $4.2 million for 2007.

229.    The HHI Board Members also failed to question how the hospital could operate at least at a break-even level going forward without the one-time cash infusions provided in 2007 by Bon Secours, the State and the working capital from the 2007 Bonds.

230.     The audited financial statements presented at the April 30, 2008 meeting also included a balance sheet of HHI which reflected accounts payable and accrued liabilities of $18.8 million.

231.     The HHI Board members failed to question Holzberg or DiVito as to why this amount of liabilities was more than $7 million higher than the $11.3 million of accounts payable and accrued expenses projected for the hospital in the Business Plan for 2007.

232.     The HHI Board members failed to question Holzberg or DiVito as to how they intended to ensure that such liabilities owed to HHI's creditors would be satisfied.

233.     The only other meeting of the HHI Board in 2008 took place on September 4, 2008.

234.     That meeting lasted forty minutes, a portion of which was dedicated to a financial update.

235.     Although no financial statements were distributed to or requested by the HHI Board members, Holzberg reported that "we are doing very well and expect a margin at year-end," while he noted that, previously, a shortfall was expected due to elimination of certain charity care payments and a reduction in DSH funding.

236.     Holzberg also stated that "our cash flow will improve with the restructuring of the Bonds."

237.     No questions were asked by the HHI Board members at the September 4, 2008 meeting about the issue with the cash flow or why the bonds needed to be refinanced.

238.     Apparently no member of the HHI Board reviewed or inquired about the Official Statement accompanying the Series 2008 Bonds in which the Authority projected an insufficiency of current revenues to meet ongoing monthly operating expenses.

239.    Had even the most rudimentary questions been asked or any review conducted, the HHI Board members would have discovered that the hospital generated insufficient revenues to meet ongoing monthly operating expenses.

240.    Thus, the HHI Board failed to familiarize themselves with HHI's finances and failed to monitor the performance of HHI's management team throughout 2007 and 2008.

241.    On October 27, 2009, the HHI Board held a special meeting at which the results of McEnerney's audit of the hospital's 2008 financial statements were presented and discussed.

242.    The audit revealed that the hospital suffered an operating loss of $22.3 million in 2008, as opposed to the operating loss of $4.3 million reported to the HHI Board and the Authority Board by Holzberg and DiVito in January 2009.

243.    The agenda of the October 27, 2009 meeting included, among other things, a proposed: (1) removal of DiVito from the HHI Board; (2) declaration of DiVito in breach of his fiduciary duties to the corporation; and (3) declaration of MSS (DiVito's consulting company) to be in breach of its agreement with HHI.

244.    DiVito was present at the meeting and given an opportunity to speak.

245.    Without any indication of a discussion among the board members, the minutes of the October 27, 2009 meeting reflect that the HHI Board adopted resolutions whereby DiVito's resignation from the board was accepted effective immediately, yet his consulting agreement through MSS was to remain in effect until May 1, 2010.

246.    Thus, inexplicably, after seeking to hold DiVito in violation of his fiduciary duties and his contract, and firing him on the spot, the HHI Board agreed to pay ( and HHI did pay) consulting fees to DiVito for an additional seven months.

N.      **Authority Board Defendants' Failure of Oversight**

247.    Through the MHAL, the State Legislature charged the Authority Board with the ultimate responsibility for the hospital's operations.

248.    To that end, the HHI By-Laws and the Management Agreement vested the Authority Board with the mechanism to monitor and control HHI's management and financial affairs.

249.    The Authority Board failed to exercise its duties.

250.    The finance committee should have closely reviewed and analyzed the budgets and financials presented by HHI's management, particularly in light of the history of massive losses historically suffered by the hospital.

251.    Instead, it allowed Holzberg and DiVito to dictate the manner in which financial reporting was done.

252.    Upon information and belief, the finance committee did not even maintain minutes of its meetings.

253.    Upon information and belief, the financial reporting by Holzberg and DiVito at the meetings generally lasted only 60-90 seconds.

254.    Apparently, Holzberg and DiVito insisted that any financial information distributed to the finance committee at the meetings be returned at the conclusion of each meeting.

255.    The Authority Board and its finance committee failed to question or have any meaningful discussions regarding HHI management's financial presentations.

256.    The Authority Board and its finance committee abdicated their duties of financial oversight, allowing HHI's management to perpetuate operations premised on material

inaccuracies regarding the hospital's financial condition and drive HHI into ever deepening insolvency

257.    The Authority Board ignored numerous red flags of the hospital's dire financial condition and HHI's insolvency.  Instead of looking into those red flags, the Authority Board simply accepted without question that a previously failing hospital had suddenly become profitable shortly after simply changing the name on the door in 2007.

258.    For example, as early as April 25, 2007, the Authority Board was advised by DiVito that "[a]ccumulated YTD numbers show a profit from operations and non-operating margins in excess of $2M."

259.    Nobody on the Authority Board questioned how the operations could be transformed so quickly from years of historical losses to significant profits within 60 days of new ownership.

260.    On May 23, 2007, DiVito advised the Authority Board that there was a marginal profit of approximately $915,000 for the quarter ending April 30, 2007.

261.    Once again, nobody questioned or discussed how the institution became profitable in such a short period of new ownership.

262.    The one time gift from Bon Secours and infusion from the State masked $4 million of losses in 2007, but the Authority Board failed to question the impact of such large non-recurring items on the financial results or how the absence of such one time funds would affect future operations.

263.    The substantial negative discrepancies between the Business Plan, budgets and reported results simply were not questioned or addressed; and the rapid growth of accounts

payable, which greatly varied from the Business Plan projections, was not questioned or addressed.

264.    The delivery of an audit of 2008 financial statements – which ultimately revealed $22.3 million of losses – was delayed by HHI's management for many months until the end of October 2009, but the Authority Board failed to press the HHI management for a meaningful explanation of the delay.

265.    As losses were mounting, the Authority Board failed to make any meaningful effort to understand the true financial condition of the hospital.

266.    No one on the Authority Board questioned, tested or otherwise challenged any financial presentations (to the extent that there were actual financial presentations) during 2007, 2008 and most of 2009.  Despite the history of the hospital's finances and the magnitude of the fiscal problems plaguing the hospital, of which each member of the Authority Board should have been aware, the Authority Board did virtually nothing.

**O.    Hodulik's Audits of HHI's 2007 and 2008 Financial Statements**

267.    Hodulik audited HHI's 2007 and 2008 financial statements (the "2007-08 Financial Statements") and issued unqualified audit reports, dated March 27, 2008 and May 28, 2009, respectively (the "Hodulik Reports"), opining that the 2007-08 Financial Statements presented fairly in all material respects HHI's financial position  as of December 31, 2007 and December 31, 2008, respectively.

268.    In fact, HHI's 2007-08 Financial Statements did not present fairly in all material respects HHI's financial position in accordance with Generally Accepted Accounting Principles ("GAAP") because they were materially false or misleading as a result of the overstatement of HHI's assets.

269.    HHI's balance sheet as of December 31, 2007, audited by Hodulik reflected an account receivable due from the Authority - the management fees owed to HHI pursuant to the Manager Agreement – in the amount of $12,009,670.

270.    HHI's balance sheet as of December 31, 2008, audited by Hodulik reflected an account receivable due from the Authority – also representing the management fees pursuant to the Manager Agreement – in the amount of $15,945,101.

271.    The notes accompanying the Hodulik Reports acknowledged, among other things, that the Authority's ability to fund HHI's management fees (which constituted the receivable due from the authority and represented the expenses incurred by HHI in operating the hospital) was limited by the amount of revenues generated by the hospital, after the debt service payments on the bonds were made pursuant to the Trust Indenture.

272.    Because the Authority's ability to satisfy its obligations to HHI was constrained by the revenues generated by the hospital, HHI's balance sheets for 2007 and 2008 should have reflected an appropriate reserve against the account receivable due from the Authority to reflect the risk of collectability of the full amount of such account receivable.

273.    HHI's balance sheets for 2007 and 2008, audited by Hodulik, failed to include any reserve to account for the risk of collectability of the full amount of the account receivable due from the Authority.

274.    As a result of such failure, HHI's 2007-08 Financial Statements did not present fairly in all material respects HHI's financial position in accordance with GAAP because the value of HHI's assets was materially overstated.

275.    Had HHI's balance sheets for 2007 and 2008 contained an appropriate reserve for the account receivable due from the Authority, the value of HHI's liabilities would have materially exceeded the value of HHI's assets, indicating that HHI was insolvent.

276.    As the auditor of the 2007-08 Financial Statements, Hodulik was required to comply with Generally Accepted Auditing Standards ("GAAS") in performing the audits and issuing its reports .

277.    Although HHI's management prepared the 2007-08 Financial Statements, it was Hodulik's responsibility, as reflected in its reports, "to obtain reasonable assurance about whether the financial statements are free of material misstatement . . . [and] assessing the accounting principles used and significant estimated made by management . . .."

278.    According to the Hodulik Reports, Hodulik's audit examinations were conducted in accordance with GAAS, and it was Hodulik's opinion that the 2007-08 Financial Statements fairly presented the financial condition of HHI in all material respects.

279.    However, Hodulik's audit procedures should have revealed that the 2007-08 Financial Statements did not fairly present the financial condition of HHI in all material respects because, *inter alia*, the full amount of the account receivable due from the Authority should not have been recorded as an asset on HHI's balance sheets.

280.    As the independent auditor Hodulik was required to test the reasonableness of the account receivable due from the Authority, and confirm that HHI's treatment of  such asset in its financial statements was in accordance with GAAP.

281.    An independent auditor performing these tasks in accordance with GAAS would have determined that the net realizable value of the account receivable due from the Authority was materially less than the face amounts set forth on HHI's 2007 and 2008 balance sheets.

282.    An independent auditor performing an audit of HHI's financial statements in accordance with GAAS would also have required that HHI management record appropriate reserves to account for the risk of collection of the full amount of the account receivable due from the Authority.

283.    An independent auditor performing an audit of HHI's financial statements in accordance with GAAS would also have recognized that the account receivable due from the Authority grew from $12,009,670 in 2007 to $15,945,101 in 2008 and challenged HHI's management to explain why this happened and how it impacted the collectability of the receivable.

284.    An independent auditor performing an audit of HHI's financial statements in accordance with GAAS would also have conducted testing of the collections on the account receivable due from the Authority subsequent to the 2007 and 2008 fiscal year ends and prior to the issuance of the respective Hodulik Reports to analyze whether HHI's management's view of the collectability of the receivable was supportable in light of subsequent events.

285.    Subsequent testing of the account receivable due from the Authority would have revealed that the receivable continued to grow because the Authority did not have the ability to pay the accrued management fees because of insufficient revenues to meet the expenses incurred by HHI in operating the hospital.

286.    Subsequent testing of the account receivable due from the Authority would also have assisted Hodulik to determine the collectability (or lack thereof) of the receivable due from the Authority.

287.     Hodulik failed to see the obvious issues regarding the collectability of the receivable due from the Authority and, upon information and belief, failed to conduct any investigation regarding the collectability of the receivable.

288.     If Hodulik had performed its audit in accordance with GAAS, Hodulik would have determined that the account receivable due from the Authority was materially overstated on HHI's 2007 and 2008 balance sheets and that the 2007-08 Financial Statements were not in accordance with GAAP.

289.     Had Hodulik performed its audit in accordance with GAAS, Hodulik would have discovered that HHI was insolvent.

290.     Hodulik's failure, as early as March 2008, to determine that the value of the account receivable due from the Authority was materially overstated on HHI's balance sheet and identify the materially false or misleading nature of HHI's financial statements and the insolvency of HHI, allowed HHI to continue to operate by accruing expenses that it was unable to pay and deepened its insolvency, all to the detriment of HHI and its creditors.

P.     **McEnerney's Audit of HHI's 2009 Financial Statements**

291.     McEnerney audited HHI's 2009 financial statements (the "2009 Financial Statements") and issued an unqualified audit report, dated September 2, 2010 (the "McEnerney 2009 Report"), opining that the 2009 Financial Statements presented fairly in all material respects HHI's financial position  as of December 31, 2009.

292.     In fact, HHI's 2009 Financial Statements did not present fairly in all material respects HHI's financial position in accordance with GAAP because they were materially false or misleading as a result of the overstatement of HHI's assets.

293.     HHI's balance sheet as of December 31, 2009, audited by McEnerney, reflected an account receivable due from the Authority in the amount of $27,851,938.

294.    The notes accompanying the McEnerney 2009 Report acknowledged, among other things, that the Authority's ability to fund HHI's management fees was limited by the amount of revenues generated by the hospital, after the debt service payments on the bonds were made pursuant to the Trust Indenture.

295.    The notes accompanying the McEnerney 2009 Report also state with respect to the collectability of the receivable due from the Authority that "[m]anagement believes all amounts are collectible."

296.    The notes also indicate that "[o]n July 30, 2010, . . .[the Authority] issued a request for Proposal (RFP) seeking proposals from parties interested in acquiring the Hoboken University Medical Center and its affiliated entities."

297.    Because the Authority's ability to satisfy its obligations to HHI was constrained by the revenues generated by the hospital, and given the historical material insufficiency of the hospital's revenues to meet its operating expenses in 2007, 2008 and 2009, the HHI management should have recorded on HHI's balance sheet for 2009 an appropriate reserve against the account receivable due from the Authority to reflect the risk of collectability of the full amount of such account receivable.

298.    HHI's balance sheet for 2009, audited by McEnerney, failed to include any reserve to account for the risk of collectability of the full amount of the account receivable due from the Authority.

299.    As a result of such failure, HHI's 2009 Financial Statements did not present fairly in all material respects HHI's financial position in accordance with GAAP because the value of HHI's assets was materially overstated.

300.     Had HHI's balance sheet for 2009 contained an appropriate reserve for the account receivable due from the Authority, the value of HHI's liabilities would have materially exceeded the value of HHI's assets, indicating that HHI was insolvent.

301.     As the auditor of the 2009 Financial Statements, McEnerney was required to comply with GAAS in performing the audit and issuing its report.

302.     Although HHI's management prepared the 2009 Financial Statements, it was McEnerney's "responsibility to express an opinion on these financial statements based on . . . [McEnerney's] audit."

303.     According to the McEnerney Report, McEnerney's audit examinations were conducted in accordance with GAAS, and it was McEnerney's opinion that the 2009 Financial Statements fairly presented the financial condition of HHI in all material respects.

304.     However, McEnerney should have known that the 2009 Financial Statements did not fairly present the financial condition of HHI in all material respects because, the full amount of the account receivable due from the Authority should not have been recorded as an asset on HHI's balance sheets.

305.     As the independent auditor McEnerney was required to ascertain the collectability of the account receivable due from the Authority, and confirm that HHI's treatment of  such asset in its financial statements was in accordance with GAAP.

306.     An independent auditor performing these tasks in accordance with GAAS would have determined that the net realizable value of the account receivable due from the Authority was materially less than the face amount set forth on HHI's 2009 balance sheet.

307.     By the time McEnerney issued its 2009 audit report in September 2010, McEnerney had actual knowledge of the depth of the financial problems plaguing the Authority and HHI.

308.     As the Authority's auditor, McEnerney knew, based on its own examination of the Authority's 2007, 2008 and 2009 financial statements, that the Authority's operating losses in 2007 were in excess of $4 million, in 2008 the operating losses were in excess of $22 million and in 2009 the operating losses were in excess of $14 million.

309.     Based on its audit of the Authority's 2008 financial statements, McEnerney also had actual knowledge that the Authority's revenues were materially overstated as a result of HHI's management's erroneous accounting of the Authority's revenues.

310.     McEnerney also knew, as reflected in the notes of the McEnerney 2009 Report, that, after three years of drastically mounting losses, the Authority had put the hospital up for sale, which should have served as another reason for McEnerney to question the collectability of the account receivable due to HHI from the Authority.

311.     Despite all of the information that should have led McEnerney to question the collectability of the account receivable due to HHI from the Authority, McEnerney issued an unqualified opinion on HHI's 2009 Financial Statements.

312.     An independent auditor in a position similar to that of McEnerney performing an audit of HHI's financial statements in accordance with GAAS would have required that HHI management record appropriate  reserves to account for the risk of collection of the full amount of the account receivable due from the Authority.

313.     An independent auditor in a position similar to that of McEnerney performing an audit of HHI's financial statements in accordance with GAAS would also have recognized that

the account receivable due from the Authority grew from $12,009,670 in 2007 to $15,945,101 in 2008 to $27,857,938 in 2009 and challenged or otherwise scrutinized HHI's management to explain how it impacted the collectability of the receivable.

314.   An independent auditor in a position similar to that of McEnerney performing an audit of HHI's financial statements in accordance with GAAS would also have conducted testing of the collections on the account receivable due from the Authority subsequent to the 2009 fiscal year ends and prior to the issuance of the McEnerney 2009 Report in September 2010 to analyze whether HHI's management's view of the collectability of the receivable was supportable in light of actual subsequent events.

315.   Subsequent testing of the account receivable due from the Authority would have revealed that the receivable continued to grow because the Authority did not have sufficient revenues to meet the expenses incurred by HHI in operating the hospital.

316.   McEnerney failed to see the obvious issues regarding the collectability of the receivable due from the Authority and, upon information and belief, failed to conduct any investigation regarding the collectability of the receivable.

317.   If McEnerney had performed its audit in accordance with GAAS, it would have determined that the account receivable due from the Authority was materially overstated on HHI's 2009 balance sheet and that the 2009 Financial Statements were not in accordance with GAAP.

318.   Had McEnerney performed its audit in accordance with GAAS, McEnerney would have discovered that HHI was insolvent.

319.   McEnerney's failure to determine that the value of the account receivable due from the Authority was materially overstated on HHI's balance sheet and identify the materially

false or misleading nature of HHI's financial statements and the insolvency of HHI, allowed HHI to continue to operate by accruing expenses that it was unable to pay and deepened its insolvency, all to the detriment of HHI and its creditors..

## Q.    Reconstitution of the Authority Board and Sale of Hospital

320.    After the publication of the Authority's 2008 financial statements audit in October 2009, which disclosed an operating loss of $22.3 million, the membership of the Authority Board was almost completely reconstituted by early 2010.

321.    Faced with the fact that the hospital had been operating at a substantial loss and continued to incur mounting liabilities, the new Authority Board determined, in early 2010, that it needed to retain professional consultants to help evaluate strategic alternatives for the hospital, including through a sale, a financial restructuring, bankruptcy, or otherwise.

322.    The Authority retained Lowenstein Sandler, P.C. as special counsel and PricewaterhouseCoopers as financial advisers, to assess the hospital's financial condition and devise a plan to maximize strategic opportunities.

323.    On July 30, 2010, the Authority issued and widely distributed a Request for Proposals for the Privatization of Hoboken University Medical Center (the "RFP"), seeking proposals from parties interested in acquiring or partnering with the hospital.

324.    On April 20, 2011, the Authority entered into an Asset Purchase Agreement with Hudson Hospital Opco, LLC and Hudson Hospital Propco, LLC (collectively, the "Purchaser") pursuant to which the Authority agreed to transfer substantially all of its assets comprising the hospital and to cause HHI to transfer to the Purchaser all of its right, title and interest in certain assets required for the operation of the hospital.

325.    On August 1, 2011, the Debtor filed its Chapter 11 petition to facilitate the Authority's sale of the hospital's assets to the Purchaser.

## COUNT I

## BREACH OF FIDUCIARY DUTY
### (As to Defendant Holzberg)

326.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

327.    As CEO of HHI, Holzberg owed fiduciary duties to HHI and its creditors to exercise reasonable skill and care:  (i) to familiarize himself with the financial condition of the hospital;  (ii) to report accurately (and make sure others reported accurately) to the HHI Board and the Authority Board regarding the financial condition of the hospital; and (iii) to take appropriate action based on that condition.

328.    Holzberg failed to exercise reasonable skill and care to familiarize himself with the financial condition of the hospital.  Had he exercised such skill and care, he would have known that the hospital was operating at a loss, suffering a severely declining financial position, and that HHI was accruing accounts payable that it was unable to pay.

329.    Holzberg failed to exercise reasonable skill and care to report accurately (and make sure others reported accurately) to the HHI Board and the Authority Board regarding the financial condition of the hospital.  Had he exercised such skill and care, the HHI Board and the Authority Board would have known that the hospital was operating at a loss, suffering a severely declining financial position, and that HHI was accruing accounts payable that it was unable to pay and the HHI Board and the Authority Board could have taken appropriate action in response to HHI's deteriorating financial condition.

330.    Holzberg failed to exercise reasonable skill and care to take appropriate action in response to HHI's deteriorating financial condition.  Had he done so, the deepening insolvency of HHI could have been averted or mitigated such that HHI would not have continued to incur increasing indebtedness it was unable pay.

331.     By reason of the foregoing, Holzberg breached his fiduciary duty owed to HHI and its creditors, and HHI and its creditors have been damaged thereby.

## COUNT II

## BREACH OF FIDUCIARY DUTY
### (As to Defendant DiVito)

332.     Plaintiff (in his capacity as Debtor Representative) repeats and realleges all prior allegations as if fully set forth herein.

333.     As CFO of HHI, DiVito owed fiduciary duties to HHI and its creditors to exercise reasonable skill and care:  (i) to familiarize himself with the financial condition of the hospital; (ii) to report accurately (and make sure others reported accurately) to the HHI Board and the Authority Board regarding the financial condition of the hospital; and (iii) to take appropriate action based on that condition.

334.     DiVito failed to exercise reasonable skill and care to familiarize himself with the financial condition of the hospital.  Had he exercised such skill and care, he would have known that the hospital was operating at a loss, suffering a severely declining financial position, and that HHI was accruing accounts payable that it was unable to pay.

335.     DiVito failed to exercise reasonable skill and care to report accurately (and make sure others reported accurately) to the HHI Board and the Authority Board regarding the financial condition of the hospital.  Had he exercised such skill and care, the HHI Board and the Authority Board would have known that the hospital was operating at a loss, suffering a severely declining financial position, and that HHI was accruing accounts payable that it was unable to pay and the HHI Board and the Authority Board could have taken appropriate action in response to HHI's deteriorating financial condition.

336.    DiVito failed to exercise reasonable skill and care to take appropriate action in response to HHI's deteriorating financial condition.  Had he done so, the deepening insolvency of HHI could have been averted or mitigated such that HHI would not have continued to incur increasing indebtedness it was unable pay.

337.    By reason of the foregoing, DiVito breached his fiduciary duties owed to HHI and its creditors, and HHI and its creditors have been damaged thereby.

## COUNT III

### BREACH OF FIDUCIARY DUTY
**(As to the HHI Board Defendants)**

338.    Plaintiff, in his capacity as Debtor Representative, repeats and realleges all prior allegations as if fully set forth herein.

339.    The HHI Board Defendants owed fiduciary duties to HHI and its creditors to: (i) to familiarize themselves with the financial condition of the hospital;  and (ii) to take appropriate action based on that condition.  These duties included the obligations to ensure that adequate internal controls and reporting systems were in place and properly utilized, and, given the existing insolvency and deepening insolvency of HHI, to prevent further incurring of indebtedness that there was no reasonable prospect of repaying.

340.    The HHI Board Defendants were grossly negligent and/or recklessly disregarded their fiduciary duties, by, among other things: failing to hold regular board meetings throughout 2007, 2008 and most of 2009; failing to require regular, documented financial reporting from HHI's management; failing to insist on timely audits; failing to question HHI management's facially doubtful reporting of  HHI's and the hospital's financial condition and/or failing to take appropriate action in response to HHI's deteriorating financial condition.

341.    The HHI Board Defendants' grossly negligent and/or reckless breaches of their fiduciary duties allowed the hospital to continue operating at a substantial loss, permitted HHI's insolvency to deepen, and caused HHI to accrue liabilities that it was unable to satisfy.

342.    By reason of the foregoing, the HHI Board Defendants breached their fiduciary duties and, as a result, HHI and its creditors have been damaged thereby.

## COUNT IV

### BREACH OF FIDUCIARY DUTY
**(As to the Authority Board Defendants)**

343.    Plaintiff, in his capacity as Debtor Representative,  repeats and realleges all prior allegations as if fully set forth herein.

344.    The Authority Board Defendants owed fiduciary duties to HHI and its creditors as a result of, *inter alia*, the authority and responsibility for the hospital's operations and finances vested in them by the MHAL, HHI's By-Laws and the Manager Agreement and/or their actual course of conduct.

345.    In effect, the Authority Board Members acted as either as an additional HHI board or were vested with the power and control to act as a board.

346.    By their nearly complete abdication of their authority, oversight and responsibility, including their failure to familiarize themselves with the financial condition of the hospital in 2007, 2008, and most of 2009 and to take appropriate action as a result, the Authority Board Defendants breached their fiduciary duties.

347.    The Authority Board Defendants failure to exercise the required degree of diligence, care and skill that reasonably prudent board members would exercise under similar circumstances, allowed the hospital to continue operating at a substantial loss and caused HHI to

accrue liabilities that it was unable to satisfy, resulting in HHI's insolvency and deepening insolvency.

348. The Authority Board Defendants were grossly negligent and/or recklessly disregard their duties.

349. By reason of the foregoing, the Authority Board Defendants breached their fiduciary duties to HHI and its creditors, and HHI and its creditors have been damaged thereby.

## COUNT V

## WASTE OF CORPORATE ASSETS
**(As to the HHI Board Defendants)**

350. Plaintiff, in his capacity as Liquidating Trustee, repeats and realleges all prior allegations as if fully set forth herein.

351. In October 2009, after declaring DiVito in violation of his fiduciary duties and his contract and firing him on the spot, the HHI Board agreed to pay DiVito consulting fees for an additional seven months, through May 1, 2010, for no meaningful consideration.

352. The HHI Board wasted HHI's scarce corporate assets in doing so while HHI's creditors were owed in excess of $30 million of debt that HHI had no ability to repay.

353. By reason of the foregoing, the HHI Board Defendants wasted HHI's assets and are liable to Plaintiff for such waste.

## COUNT VI

## AVOIDANCE OF FRAUDULENT TRANSFERS (11 U.S.C. §§ 548(a) and 550)
**(As to Defendants DiVito and Medical Support Systems, Inc.)**

354. Plaintiff, in his capacity as Liquidating Trustee, repeats and realleges all prior allegations as if fully set forth herein.

355. As a result of DiVito's breaches of his fiduciary duties and his resignation, no amounts were due to DiVito under his consulting agreement with HHI through MSS.

356.     After DiVito's resignation from the HHI Board on October 27, 2009, DiVito ceased to provide any services to HHI, nevertheless he continued to receive consulting fee payments through MSS until May 1, 2010.

357.     HHI was insolvent on the dates that it made the consulting fee payments to DiVito.

358.     HHI received less than reasonably equivalent value in exchange for the consulting fee payments to DiVito.

359.     The consulting fee payments to DiVito subsequent to October 27, 2009 (the "DiVito Fraudulent Transfers") are voidable and recoverable from DiVito and/or MSS pursuant to 11 U.S.C. §§ 548(a) and 550.

## COUNT VII

### AVOIDANCE OF TRANSFERS (11 U.S.C. §§ 544 and 550 and N.J.S.A. §25:2- 25)
(As to Defendant DiVito and Medical Support Systems, Inc.)

360.     Plaintiff, in his capacity as Liquidating Trustee, repeats and realleges all prior allegations as if fully set forth herein.

361.     There exists at least one creditor holding an unsecured claim against HHI whose claim arose before or after the DiVito Fraudulent Transfers were made.

362.     HHI made the DiVito Fraudulent Transfers without receiving reasonably equivalent value in exchange therefor.

363.     At the time HHI made the DiVito Fraudulent Transfers, HHI intended to incur, or believed or reasonably should have believed that HHI would incur, debts beyond HHI's ability to pay as they become due.

364.     Accordingly, The DiVito Fraudulent Transfers are voidable and recoverable from DiVito and/or MSS pursuant to 11 U.S.C. §§ 544 and 550 and N.J.S.A. §25:2- 25).

## COUNT VIII

### AVOIDANCE OF TRANSFERS (11 U.S.C. §§ 544 and 550 and N.J.S.A. §25:2- 27)
### (As to Defendant DiVito and Medical Support Systems, Inc.)

365.    Plaintiff, in his capacity as Liquidating Trustee, repeats and realleges all prior allegations as if fully set forth herein.

366.    There exists at least one creditor holding an unsecured claim against HHI whose claim arose before the DiVito Fraudulent Transfers were made.

367.    HHI made the DiVito Fraudulent Transfers without receiving reasonably equivalent value in exchange therefor.

368.    HHI was insolvent at that time HHI made the DiVito Fraudulent Transfers or became insolvent as a result of the transfers.

369.    At the time the DiVito Fraudulent Transfers were made, DiVito was an insider of HHI.

370.    DiVito had reasonable cause to believe that HHI was insolvent at the time the DiVito Fraudulent Transfers were made.

371.    Accordingly, The DiVito Fraudulent Transfers are voidable and recoverable from DiVito and/or MSS pursuant to 11 U.S.C. §§ 544 and 550 and N.J.S.A. §25:2- 27).

## COUNT IX

### ACCOUNTANT MALPRACTICE
### (As to Defendant Hodulik)

372.    Plaintiff, in his capacity as Debtor Representative, repeats and realleges all prior allegations as if fully set forth herein.

373.    Hodulik had a duty to audit and report on HHI's financial statements in accordance with GAAS.

374.    Hodulik failed to exercise reasonable care, skill, diligence or knowledge, as required by GAAS, in performing its audit of HHI's 2007-08 Financial Statements and preparing its audit reports, which an independent auditor in good standing in similar communities would have exercised.

375.    Hodulik's failure to exercise such reasonable care, skill, diligence or knowledge caused it to fail to discover that HHI's 2007-08 Financial Statements did not present fairly in all material respects HHI's financial position in accordance with GAAP due to the material overstatement of the collectible value of the account receivable due from the Authority and the failure to record a reserve to account for the risk of collectability of the full amount of such account receivable.

376.    Hodulik's failure to exercise such diligence, care and skill in auditing the 2007-08 Financial Statements caused HHI damage by, among other things, Hodulik's failure to discover that HHI was insolvent and allowing HHI to continue to operate by accruing expenses that it was unable to pay and deepening its insolvency.

377.    By reason of the forgoing, Hodulik was negligent, committed auditor malpractice, and HHI and its creditors were damaged thereby.

## COUNT X

### ACCOUNTANT MALPRACTICE
### (As to Defendant McEnerney)

378.    Plaintiff, in his capacity as Debtor Representative, repeats and realleges all prior allegations as if fully set forth herein.

379.    McEnerney had a duty to audit and report on HHI's financial statements in accordance with GAAS.

56

380.    McEnerney failed to exercise reasonable care, skill, diligence or knowledge, as required by GAAS, in performing its audit of HHI's 2009 Financial Statements and preparing its audit report, which an independent auditor in good standing in similar communities would have exercised.

381.    McEnerney's failure to exercise such reasonable care, skill, diligence or knowledge caused it to fail to discover that HHI's 2009 Financial Statements did not present fairly in all material respects HHI's financial position in accordance with GAAP due to the material overstatement of the collectible value of the account receivable due from the Authority and the failure to record a reserve to account for the risk of collectability of the full amount of such account receivable.

382.    McEnerney's failure to exercise such diligence, care and skill in auditing the 2007-08 Financial Statements caused HHI damage by, among other things, McEnerney's failure to discover that HHI was insolvent and allowing HHI to continue to operate by accruing expenses that it was unable to pay and deepening its insolvency.

383.    By reason of the forgoing, McEnerney was negligent, committed auditor malpractice and HHI and its creditors were damaged thereby.

## CONCLUSION

**WHEREFORE,** Plaintiff requests the entry of judgment against Defendants as follows:

A.    Awarding damages on Count I against Holzberg, in an amount to be determined at trial, for breaches of his fiduciary duties;

B.    Awarding damages on Count II against DiVito, in an amount to be determined at trial, for breaches of his fiduciary duties;

C.    Awarding damages on Count III against the HHI Board Defendants, in amounts to be determined at trial, for breaches of their fiduciary duties;

D.      Awarding damages on Count IV against the Authority Board Defendants, in amounts to be determined at trial, for breaches of their fiduciary duties;

E.      On Counts VI, VII, and VIII, avoiding the DiVito Fraudulent Transfers and recovering the amounts transferred;

F.      Awarding damages on Count IX against Hodulik, in an amount to be determined at trial, for negligence and auditor malpractice;

G.      Awarding damages on Count X against McEnerney, in an amount to be determined at trial, for negligence and auditor malpractice;

H.      Awarding attorneys' fees pursuant to the extent permitted by law, including as set forth in Fed. R. Bankr. P. 7008(b);

I.      Awarding interest and cost of suit; and

J.      Awarding such other relief as the Court deems just and equitable.

Dated:  March 20, 2013

SILLS CUMMIS & GROSS P.C.
*Attorneys for Plaintiff Bernard A. Katz, as*
*Debtor Representative and Liquidating Trustee*

By:   __/s/ Andrew H. Sherman_____
      Andrew H. Sherman (AS-6061)
      George R. Hirsch
      Boris I. Mankovetskiy

## JURY DEMAND

Plaintiff hereby demands trial by jury in this action.

Dated:  March 18, 2013

SILLS CUMMIS & GROSS P.C.
*Attorneys for Plaintiff Bernard A. Katz, as*
*Debtor Representative and Liquidating Trustee*

By:    /s/ Andrew H. Sherman
        Andrew H. Sherman
        George R. Hirsch
        Boris I. Mankovetskiy